132

457 P.2d 294

The EL CORTEZ HEIGHTS RESIDENTS AND PROPERTY OWNERS ASSOCIATION, a non-profit voluntary association of property owners, by Willie R. Adams, Chairman, and J. J. Roberts, Appellants,

v.

The TUCSON HOUSING AUTHORITY, the City of Tucson, a municipality, Mel Zuckerman, and Sol Tobin, dba KTZ Builders, and the City of Tucson, a municipality, and John Does One through Five, Appellees.

No. 2 CA–CIV 588.

Court of Appeals of Arizona.

July 18, 1969.

Rehearing Denied Oct. 6, 1969.

Arthur R. Buller, Tucson, for appellants.

Bilby, Thompson, Shoenhair & Warnock, by Marvin S. Cohen, Tucson, for appellees.

KRUCKER, Judge.

The appellants, the El Cortez Heights Residents and Property Owners Association (hereinafter designated plaintiffs), petitioned for a writ of preliminary injunction and order to show cause against appellees' (hereinafter designated defendants) construction of a low-cost housing project in their residential area. Plaintiffs' allegations were also heard as a petition for permanent injunction. Both petitions were denied. Plaintiffs appealed.

The Housing Authority of the City of Tucson, created[1] pursuant to state enabling legislation,[2] was authorized to plan, develop and manage low-cost housing projects in Tucson. In 1967 planning began for several new sites. Original plans contemplated homes for the elderly; final plans came to include units for low-income family housing. Federal aid was to be annually contributed to the project. Several factors were used in choosing appropriate sites: availability of transportation, shopping, schools, business and community services, health and medical facilities, churches, improvability of land, topography, traffic congestion, zoning, etc. The Turnkey project, or North Sixth Avenue and El Capitan sites which are adjacent to each other were selected, purportedly using these criteria, from five approved sites.[3] The project will contribute 80 new family units and acquire 40 units of the El Capitan apartments for persons with a maximum $3,000 annual yearly income for a family of two children. Less than 50 per cent will be Negro, the rest will be predominately Mexican-Americans and Indians.

The El Cortez area, surrounding the two sites, is the only middle income Negro community in the county. The homes range in value from approximately $8,000–$28,000. Four of the men responsible for the selection of this area for the housing project testified that they knew generally of the racial character of the neighborhood but that officially no such consideration was used as a criterion in the selection of the site. Likewise, throughout the briefs and testimony, defendants contend that they have only a duty not to select sites which by design are chosen to concentrate racial groups.

Plaintiffs present two major allegations of error. First, they contend the trial court erred in its findings of fact. Findings of fact were:

1. Valid criteria were used to choose project sites.

2. Good faith discretion was used by the authority in selecting sites.

3. All legal requirements in selecting the sites were used.

4. The projects will not be occupied primarily by Negroes.

5. The completion of the project will tend to result in a reduced proportion of Negro to non-Negro residents in the project.

6. The project will have no adverse effect on surrounding property values.

Second, plaintiffs contend that the placement of the Turnkey project violated their constitutional rights by the selection of their particular neighborhood, which will have the inevitable result of perpetuating the isolation of racial and national groups. They claim that this violation constituted an illegal action by the Housing Authority and thus is an abuse of discretion against which an injunction should issue.

We believe that the trial court was unfortunately led into error by the generalizations of claims made and the lack of poignant isolation of certain facts. To

1. Resolution No. 1712, Mayor and Council, City of Tucson, February 20, 1941.

2. A.R.S. § 36–1404

3. For good explanation of how Turnkey projects are set up see Comment, Turnkey Public Housing in Wisconsin. Wis.L.Rev. 1969:231.

begin, the tenor of the entire transcript and trial below reveals several pertinent facts. First, the El Cortez area, selected for the low income housing project, is the only middle income Negro community in the city. The Housing Authority, in selecting the site and using many worth-while and reasonable criteria, as the trial court found, admittedly rejected considering the racial character of the neighborhood and were only generally aware of its racial composition. Lastly, no evidence in the record indicates any such project has been placed in a white middle class area.

■ The mandate in federally assisted housing has been at least forceful and specific since 1962. At that time Executive Order No. 11063 issued a directive requiring nondiscriminatory federal housing. And in 1964, Congress passed Title VI, Civil Rights Act, 42 U.S.C.A. § 2000d, which provides:

"No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or *be subjected to discrimination under any program or activity receiving Federal financial assistance.* (Emphasis added)

Plaintiffs point to this statute, and to the racial character of the neighborhood and claim an injunction will lie. On those facts alone we disagree.

However, further inquiry into the statute and the regulations thereunder, reveals that the problem of racial discrimination in site selection, as distinct from consideration of discrimination in tenant selection, has become of sufficient import to warrant its specific prohibition by regulation.[4] Thus § 1.4 provides:

§ 1.4 Discrimination prohibited.

\*  \*  \*  \*  \*  \*

(2) (i) *A recipient* [state or political subdivision], *in determining the location* or types *of housing* \* \* \*

*may not,* directly or through contractual or other arrangements, *utilize criteria* or methods of administration *which have the effect of subjecting persons to discrimination because of their race,* color or national origin, or have the effect of defeating or *substantially impairing accomplishment of the objectives of the program* or activity as respect persons of a particular race, color, or national origin. 24 C.F.R. § 1.4 (1969).

■ The substance of this prohibition is to assure that housing authorities do not use criteria, or the lack thereof, which effectively result in discriminatory site selection of public housing projects financed in part by federal funds. We realize that the United States Constitution denounces racial classification for the purposes of segregating the races, but we also believe the Constitution is very color conscious, and that public housing sites should not be selected with eyes closed to the racial composition of the area. Such conduct is no more than an excuse for avoiding the responsibility of having to find criteria which will work to de-isolate racial and minority groups. We do not believe the Tucson Housing Authority can legitimately meet the mandate of the regulations mentioned and at the same time reject considering the racial character of the sites being selected. The duty imposed under the statute and the regulations is not simply the negative duty to not discriminate. It is a mandate that prohibits housing authorities from acting in a manner that results in discrimination.

We concur with the most recent view expressed in Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D.Ill. 1967); 296 F.Supp. 907 (N.D.Ill.1969) that these mandates also derive from the Fourteenth Amendment of the United States Constitution. As stated in Norwalk Core v. Norwalk Redevelopment Agency, 395

---

4. For comment on the problems in site discrimination as distinct from tenant selection discrimination see, the Public Housing Administration and Discrimination in Federally Assisted Low-Rent Housing, 64 Mich.L.Rev. 871 (1966).

F.2d 920 (2d Cir. 1968) in a similar context:

> What we have said may require classification by race. That is something which the Constitution usually forbids, not because it is as inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality. Where it is drawn for the purpose of achieving equality it will be allowed, and to the extent it is necessary to avoid unequal treatment by race, it will be required. 395 F.2d at 931–932.

■ We do not hold that the selection per se was illegal, but only that the racial character of the neighborhood cannot be ignored in choosing a low income housing site. The Authority should, however, note that the placement of public housing projects in a Negro community creates strong doubts as to its acceptability. Hicks v. Weaver, D.C., 302 F.Supp. 619 (decided June 2, 1969).

Judgment reversed.

MOLLOY, C. J., and HATHAWAY, J., concur.